**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **M.Q.,** | |
| **Plaintiff,** | **1:22-cv-10680 (ALC) (KHP)** |
| -against- | <u>**OPINION & ORDER**</u> |
| **UNITED STATES OF AMERICA,** | |
| **Defendant.** | |

**ANDREW L. CARTER JR., United States District Judge**:

Ms. Q. is a thirty-year-old Ecuadorian citizen residing in New York. Under President Biden's Administration, Ms. Q was detained, released on supervision, and re-detained by United States Immigration and Customs Enforcement. Ms. Q brings this lawsuit against the United States of America pursuant to the Federal Tort Claims Act, for alleged tortious conduct committed by ICE officers. The Government moves to dismiss two causes of action in the Third Amended Complaint, arguing that sovereign immunity protects the United States from suit and that Ms. Q fails to adequately state her claims.

In this opinion, the Court confronts a split among the U.S. Circuit Courts of Appeals regarding the applicability of the Discretionary Function Exception, pursuant to which the United States retains its sovereign immunity over certain FTCA claims. The circuit split pertains to whether this exception applies where a plaintiff alleges unconstitutional conduct. The Court follows the precedent of the Second Circuit and holds that the Discretionary Function Exception does not apply when a plaintiff plausibly alleges that a federal employee engaged in unconstitutional conduct.

For the reasons set forth below, the Government's motion is **GRANTED** as to Ms. Q's abuse of process and intentional infliction of emotional distress claims, and **DENIED** in all other respects.

## BACKGROUND

### I.    Factual History

Plaintiff M.Q. ("Ms. Q" or "Plaintiff") is a citizen of Ecuador, who has lived in the United States since she was eleven. ECF No. 118 ¶¶ 27–28 ("Third Amended Complaint" or "TAC"). Ms. Q, now thirty years old, resides in Putnam County, New York with her fiancée. *Id.* ¶ 27. In July of 2020, Ms. Q pleaded guilty to second-degree vehicular assault and driving while intoxicated. *Id.* ¶ 29. During the pendency of her criminal case, Ms. Q was placed into removal proceedings. *Id.* ¶ 30. In August of 2021, Ms. Q was released on parole by the New York State Department of Corrections and Community Supervision and immediately transferred to the custody of United States Immigration and Customs Enforcement ("ICE") pursuant to a removal order. *Id.* ¶ 31.

On or around August 12, 2021, ICE officers transported Ms. Q to a Department of Homeland Security ("DHS") office in Latham, New York, with her ankles, waist, and hands restrained. *Id*. ¶ 33. While walking to the back of the building, Ms. Q's restraints got caught on a drain grate. *Id.* After the ICE officers ordered her to keep moving, she slipped and—unable to catch herself due to the restraints binding her arms to her waist—injured her ankle, arms, and face. *Id*. ¶ 34. An ICE officer then attempted to dislodge the restraints from the grate by physically twisting Ms. Q's body and tugging on the chain around her ankle. *Id.* This caused her significant pain and further injured her ankle. *Id*.

Crying and complaining of severe pain, Ms. Q requested that the ICE officer temporarily remove her ankle restraints, which the officer granted. *Id.* ¶ 35. Ms. Q informed the ICE officer that she could no longer move her ankle, but the officer picked her up and ordered her to keep moving toward the building, unassisted and without any medical attention. *Id.* Once inside, Ms. Q was put into a room and waited to receive an ice pack for her ankle, which was swelling and

changing color. *Id.* ¶¶ 36–37. Despite being told that she would be taken to an emergency room, ICE transported her to Rensselaer County Jail ("RCJ") in Troy, New York. *Id.* ¶ 39.

Once inside RCJ, Ms. Q was processed for immigration custody before receiving medical care. *Id.* ¶ 41. Later that day medical staff conducted an X-ray on Ms. Q and provided her with over-the-counter pain medication and a crutch. *Id.* At RCJ, Ms. Q was held in an unsanitary solitary confinement cell for two weeks, with no access to showers and no communication with her family or other prisoners. *Id.* ¶ 42.

Over a month after her arrival at RCJ, following a complaint Ms. Q's counsel filed with the DHS Office for Civil Rights and Civil Liberties (CRCL), RCJ medical staff evaluated Ms. Q's ankle and concluded that she needed to see a specialist for an MRI. *Id.* ¶¶ 47, 49. Yet, before any imaging could be taken, ICE officers informed Ms. Q she was to be deported immediately. *Id.* ¶ 50. While in transit, the officers informed Ms. Q that her flight was canceled, and that they would be returning to RCJ. *Id.* The officers told her that they would return in two weeks' time for her deportation, heightening her anxiety. *Id.*

While at RCJ, Ms. Q's mental health began deteriorating; she experienced panic attacks, insomnia, and anxiety. *Id.* ¶ 51. Two months into her time at RCJ, around October 2021, she was referred for mental health care, but there was no follow-up. *Id.* On or around October 26, 2021, ICE officers took Ms. Q to see an orthopedist outside of RCJ. *Id.* ¶ 55. The doctor suspected she had ligament or tendon damage in her ankle, performed an X-ray, and scheduled her for an MRI in November 2021. *Id.* ¶ 55. On November 18, 2021, Ms. Q received her MRI, which revealed a right ankle fracture. *Id.* ¶ 57.

During a November 30, 2021 follow-up visit to the orthopedist, the doctor confirmed that Ms. Q's ankle had not been healing properly, exacerbated in part because of the weight she was

putting on it. *Id.* ¶ 58. He informed her this could cause lasting issues to her ankle. *Id.* Ms. Q alleges that the delay in care significantly worsened her injury. *Id.* Three months after the injury occurred, Ms. Q was finally given a cast and an orthopedic boot. *Id.*

Earlier in November, ICE conducted a custody review and declined to release Ms. Q. *Id.* ¶ 56. On November 21, 2021, Ms. Q's counsel filed a Federal Tort Claims Act ("FTCA") complaint with DHS and ICE "detailing her injury, denial of medical treatment, arbitrary punishment, and extreme emotional harm." *Id.* ¶ 57.

On December 3, 2021, ICE released Ms. Q from custody on an Order of Supervision ("OSUP"). *Id.* ¶ 59. The OSUP required Ms. Q to attend a supervision appointment at 26 Federal Plaza on December 7, 2021. *Id.* Ms. Q attended the appointment and was allowed to return home. *Id.* Her next appointment was scheduled for December 6, 2022. *Id.*

Following her release, Ms. Q visited another orthopedic doctor, who removed her cast and started her on physical therapy. *Id.* ¶ 60. Due to Ms. Q's continued pain, her doctor ordered a CT scan, which revealed she had a bone spur that could require surgery. *Id.* The pain affected her ability to work her job at a deli counter, as she allegedly suffered constant pain from standing. *Id.* Adding to this decreased quality of life, Ms. Q continued to experience nightmares, insomnia, hypervigilance, and depression. *Id.* ¶ 62. She sought mental health counseling as a result. *Id.* Her counselor observed "indicia of Post-Traumatic Stress Disorder" and referred her to a psychiatrist, who prescribed anxiety and insomnia medication. *Id.* ¶ 63.

While released, Ms. Q spoke with numerous immigrant rights organizations about her experience in ICE custody. *Id.* ¶ 65. She began attending immigrant rights rallies and recounting her detention story publicly. *Id.* Ms. Q testified at a New York City Council hearing on

immigration detention on February 28, 2022 and at a New York State Assembly roundtable on March 2, 2022. *Id.* ¶ 66. Ms. Q alleges that her public advocacy was known to ICE. *Id.*

Around the same time, Ms. Q also met with attorneys about her legal claims. *Id.* ¶ 64. On December 1, 2022, Ms. Q's attorney emailed ICE officers, inquiring whether any specific issues would be addressed during the December 6th appointment and requesting Ms. Q's travel documents. *Id.* ¶ 67. Officer William Kennedy responded that he had two expired travel documents and saw no specific issues to address, describing it as a routine report. *Id.*

On December 6, 2022, Ms. Q and her lawyer arrived for her appointment and waited several hours, allegedly being told that Ms. Q's case was "special." *Id.* ¶ 68. Officer Kevin King separated Ms. Q from her attorney and informed her attorney that ICE was taking Ms. Q back into custody. *Id.* ¶ 69. Ms. Q's attorney asked if the decision was due to a change in circumstances, to which Officer King allegedly confirmed there were no changed circumstances, but maintained ICE was continuing with Ms. Q's re-detention. *Id.* ¶ 71.

Ms. Q alleges that there was no prior notice her OSUP would be revoked and that neither Ms. Q nor her attorney were afforded an opportunity to respond to the revocation. *Id.* ¶ 72. Additionally, Ms. Q alleges that she received a Notice of Revocation after the fact, which was also deficient. *Id.* The Notice claimed that ICE was revoking Ms. Q's supervised release because they obtained a valid travel document and her deportation was imminent, contrary to Officer King's response on December 1, 2022, as well as ICE counsel's own confirmation that no such document existed at that time. *Id.* ¶ 73.

After her OSUP was revoked, ICE transported Ms. Q to Orange County Jail ("OCJ") in Goshen, New York, and informed her that she would be deported within two to three weeks. *Id.* ¶ 75. In the end, Ms. Q was detained for three months. *Id.* ¶ 78. This included a period of more than

ten days when Ms. Q was placed in solitary confinement. *Id.* ¶ 76. Although she was provided with some pain medication and an ankle brace while in custody, Ms. Q alleges that her health worsened during that time and her ankle had still not healed. *Id.* ¶ 78. She experienced night terrors and panic attacks, but was not given access to any psychiatric medication or mental health counseling, despite her repeated requests. *Id.*

## II.    Procedural History

On December 19, 2022, Ms. Q filed a petition for a writ of habeas corpus and an FTCA complaint, initiating this action. ECF No. 1; *see also* TAC ¶ 79. Ms. Q's counsel informed ICE that she was filing a motion to reopen her case with the Board of Immigration Appeals ("BIA"). TAC ¶ 79. On January 27, 2023, this Court stayed Ms. Q's removal to allow the BIA to adjudicate her motion to reopen. *See* ECF No. 40. On or around February 17, 2023, ICE held a post-order custody review and decided to continue to detain Ms. Q. TAC ¶ 81. On February 23, 2023, the BIA granted Ms. Q's motion to reopen her case. *Id.* ¶ 82. On March 15, 2023, an immigration judge granted Ms. Q release on bond. *Id.* ¶ 83. She was released the following day. *Id.*

Relevant to the instant motion, on July 3, 2024, Ms. Q filed her Third Amended Complaint ("TAC") for assault and battery, negligence, abuse of process, and intentional and negligent infliction of emotional distress pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b). ECF No. 118. On August 7, 2024, the United States of America ("Government" or "Defendant") filed a motion to dismiss her abuse of process and emotional distress claims for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. *See* ECF Nos. 120 (motion), 121 (memorandum of law). Regarding the Court's subject matter jurisdiction, the Government specifically argues that the FTCA's waiver of sovereign immunity does not apply to any claims arising from the revocation of Ms. Q's OSUP under the Discretionary Function

Exception ("DFE"). *See* ECF No. 121 at 7–13. The parties are already engaged in discovery related to Ms. Q's ankle injury and subsequent medical treatment. *See id.* at 1.

On September 11, 2024, Plaintiff filed her memorandum in opposition. ECF No. 122. On October 2, 2024, the Government filed its reply brief. ECF No. 125. On November 25, 2024, the Court held oral arguments on the Government's motion. *See* ECF Nos. 129, 134, 144.

## STANDARD OF REVIEW

### I.    Federal Rule of Civil Procedure 12(b)(1)

In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation and internal quotation marks omitted). "[B]ut jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Id.* Rather, "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). Courts "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

### II.    Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the [c]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than

a sheer possibility that a defendant has acted unlawfully," and where the plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In considering a motion to dismiss, courts accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555); *see also id.* at 681. Instead, the complaint must provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) (citing *Twombly*, 550 U.S. at 555).

## DISCUSSION

### I.    The Discretionary Function Exception

In its motion to dismiss, the Government argues that the Court lacks subject matter jurisdiction over Ms. Q's abuse of process and infliction of emotional distress claims because the United States's waiver of sovereign immunity under the Federal Tort Claims Act does not apply to discretionary acts. *See* ECF No 121 at 7. This is known as the Discretionary Function Exception ("DFE").

Specifically, the Government argues that ICE's decision to revoke Ms. Q's OSUP was discretionary and therefore outside the purview of the FTCA's waiver. Plaintiff challenges the Government's argument and asserts that ICE revoked the OSUP in an unconstitutional manner, voiding any discretion provided to the agency. *See* ECF No. 122 at 5–9. For the reasons that follow,

the Court agrees that the Government may not avail itself of the DFE and thus the FTCA's waiver of sovereign immunity applies to Ms. Q's claims.

### a. Legal Standard

"[T]he Federal Tort Claims Act . . . 'constitutes a limited waiver by the United States of its sovereign immunity and allows for a tort suit against the United States under specified circumstances.'" *Liranzo v. United States*, 690 F.3d 78, 85 (2d Cir. 2012) (quoting *Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007)). "The FTCA excludes from its waiver of sovereign immunity '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" *D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 588 (S.D.N.Y. 2022) (quoting 28 U.S.C. § 2680(a)). This is the DFE, "a form of retained sovereign immunity." *In re World Trade Ctr. Disaster Site Litig.*, 521 F.3d 169, 190 (2d Cir. 2008). The "[r]etention of that immunity is designed 'to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *D.J.C.V.*, 605 F. Supp. 3d at 588 (quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)).

"A complaint can survive a motion to dismiss . . . if it alleges facts that could embrace a non-discretionary decision that caused the injury and the United States does not 'establish that the decision in question was grounded in questions of public policy.'" *Molchatsky v. United States*, 778 F. Supp. 2d 421, 431 (S.D.N.Y. 2011) (quoting *Coulthurst v. United States*, 214 F.3d 106, 110 (2d Cir. 2000)), *aff'd*, 713 F.3d 159 (2d Cir. 2013). For the DFE to apply, "(1) the acts alleged . . . . must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in

'considerations of public policy' or susceptible to policy analysis." *Coulthurst*, 214 F.3d at 109. "However, there is no discretion for a federal official 'to behave unconstitutionally or outside the scope of his delegated authority.'" *D.J.C.V.*, 605 F. Supp. 3d at 588 (quoting *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975)). "If the Government responds [to the complaint] by demonstrating that the action falls within a discretionary framework, a plaintiff must rebut the Government's showing sufficiently to demonstrate that there is a plausible case for non-discretionary or non-policy action." *Molchatsky*, 778 F. Supp. 2d at 431.

### b. The Revocation of Ms. Q's OSUP Falls Within a Discretionary Framework

The Government argues that "ICE's decision to detain Plaintiff involved an element of choice on the part of ICE officials," and therefore falls under the protection of the DFE. ECF No. 121 at 10. The regulations governing revocation of an OSUP explicitly state that ICE has the authority to make the decision to revoke release "in the exercise of discretion." 8 C.F.R. § 241.4(l)(2). Ms. Q does not challenge that ICE had discretionary authority to revoke her release.[1] *See generally* ECF No. 122. However, even if the DFE would typically protect ICE's decision to revoke an OSUP, given Ms. Q's allegation that the decision was unconstitutional, the DFE may still not apply.

---

[1] Ms. Q does argue that ICE is not entitled to discretion in so far as it was required to follow certain procedures to revoke her OSUP. *See* ECF No. 122 at 9–11. Indeed, the same regulations cited by the Government to illustrate the discretionary framework provide that

> Upon revocation, the alien will be notified of the reasons for revocation of his or her release or parole. The alien will be afforded an initial informal interview promptly after his or her return to Service custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification.

8 C.F.R. § 241.4(l); *see also You, Xiu Qing v. Nielsen*, 321 F. Supp. 3d 451, 463 (S.D.N.Y. 2018) ("Even assuming arguendo that Respondents had the authority to revoke Petitioner's release under § 241.4 in May 2018, they could not detain him without providing him with notice and an informal interview.").

As it is questionable whether ICE's failure to adhere to these procedural requirements would entitle Ms. Q to complete relief, the Court focuses instead on the alleged violation of her First Amendment rights.

### c. The Discretionary Function Exception Does Not Protect Unconstitutional Conduct

Ms. Q argues that the DFE does not protect unconstitutional conduct as "[t]here is no discretion to violate the Constitution." ECF No. 122 at 6 (citing *D.J.C.V.*, 605 F. Supp. 3d at 588). The Government argues that the DFE protects all discretionary conduct, whether that discretion was used to violate the Constitution or not. *See* ECF No. 125 at 2. Alternatively, the Government asks the Court to find that this restriction of the DFE should be limited to unconstitutional policies conferring discretion rather than unconstitutional conduct committed pursuant to discretionary authority. *See id.* But neither argument is consistent with the law of the Second Circuit, nor the majority of U.S. Circuit Courts of Appeals. *See Leticia v. United States*, No. 22CV7527NGGRJL, 2023 WL 7110953, at *10 n.13 (E.D.N.Y. Oct. 27, 2023) (collecting cases and detailing the circuit split on this issue). In fact, a review of Second Circuit precedent, and that of our sister circuit courts, reveals that a federal employee's conduct is central to whether the Government may retain sovereign immunity pursuant to the DFE.

The Second Circuit and its district courts have consistently held that a federal officer does not have the discretion to commit constitutional violations. *See, e.g.*, *Myers & Myers, Inc. v. U. S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority."); *Huntress v. United States*, No. 18-CV-2974 (JPO), 2019 WL 1434572, at *5 (S.D.N.Y. Mar. 29, 2019) ("[T]he discretionary function exception does not shield official conduct that is . . . unconstitutional."), *aff'd*, 810 F. App'x 74 (2d Cir. 2020) (summary order); *El Badrawi v. Dep't of Homeland Sec.*, 579 F. Supp. 2d 249, 275 (D. Conn. 2008) ("Government agents never have the discretion to violate the Constitution.").

11

"Other circuits are in accord, holding that the DFE does not shield unconstitutional conduct." *D.J.C.V.*, 605 F. Supp. 3d at 591. In 2023, the First Circuit held that the relevant analysis is only whether the plaintiff has "sufficiently alleged that the [government's] alleged tortious conduct violated the Constitution." *Torres-Estrada v. Cases*, 88 F.4th 14, 21 (1st Cir. 2023); *see also Limone v. United States*, 579 F.3d 79, 102 (1st Cir. 2009) (Unconstitutional conduct was "not within the sweep of the discretionary function exception."). Likewise, the Third Circuit, in *Xi v. Haugen*, held that "because government officials never have discretion to violate the Constitution, unconstitutional government conduct is *per se* outside the discretionary function exception." 68 F. 4th 824, 839 (3d Cir. 2023). As in the Second Circuit, this focus on conduct, rather than the policy providing the agency's discretion, weighs against the Government's argument.

This analysis is also supported by the D.C. Circuit, which held that "[a] plaintiff who identifies constitutional defects in the conduct underlying her FTCA tort claim—whether or not she advances a *Bivens* claim against the individual official involved—may affect the availability of the discretionary-function defense." *Loumiet v. United States*, 828 F.3d 935, 945 (D.C. Cir. 2016). In reversing the lower court's decision, the D.C. Circuit found the relevant inquiry on remand to be whether the "complaint plausibly alleges that the [government]'s conduct exceeded the scope of its constitutional authority so as to vitiate discretionary-function immunity." *Id.* at 946.

The Fourth, Fifth, Eight, and Ninth Circuits have similarly concluded that the DFE is limited by the Constitution. *See Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("[F]ederal officials do not possess discretion to violate constitutional rights or federal statutes."); *Sutton v. United States*, 819 F.2d 1289, 1293 (5th Cir. 1987) (DFE does not apply when "governmental agents exceed the scope of their authority as designated by statute or the

Constitution."); *Raz v. United States*, 343 F.3d 945, 948 (8th Cir. 2003) (per curiam) (Surveillance activities "conducted in violation of . . . First and Fourth Amendment rights . . . f[e]ll outside the FTCA's discretionary-function exception."); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("[G]overnmental conduct cannot be discretionary if it violates a legal mandate.").

Deviating from this precedent, the Government argues that the manner in which an agency uses its discretion is completely irrelevant, even if that manner is constitutionally impermissible. *See* ECF No. 125 at 2 ("So long as ICE was exercising discretion in revoking the Plaintiff's OSUP, it would not matter that if discretion was 'abused' as Plaintiff alleges."). But this seems in direct conflict with focus on conduct in these circuit opinions. This argument, in fact, seems far more aligned with the case law of the two circuit courts which hold there is no constitutional limitation on the DFE's protection.

In *Shivers v. United States*, the Eleventh Circuit found the important question in determining the DFE's applicability is only whether "a 'function or duty' is 'discretionary.'" 1 F.4th 924, 931 (11th Cir. 2021). "The inquiry is not about how poorly, abusively, or unconstitutionally the employee exercised his or her discretion but whether the underlying function or duty itself was a discretionary one." *Id.* This is nearly identical to what the Government argues the Court should adopt; a rule where the conduct is relevant only to the extent of determining its discretionary nature, not its constitutionality.

Writing for the *Shivers* Court, Judge Hull further argued that the Second Circuit's approach allows plaintiffs to "circumvent the limitations on constitutional tort actions under *Bivens* . . . by recasting the same allegations . . . as a common-law tort claim under the FTCA that is not subject to the discretionary function exception or . . . as negating the discretionary function defense." 1 F.4th at 931; *see also id.* at 933 n.5 (acknowledging the circuit split and disagreeing with courts

13

which have "concluded that the discretionary function exception does not categorically bar FTCA tort claims where the challenged government conduct or exercise of discretion also violated the Constitution")*. The Seventh Circuit similarly found the question of constitutionality to be irrelevant to the DFE and the FTCA overall. *See Linder v. United States*, 937 F.3d 1087, 1090 (7th Cir. 2019) ("What's more, the theme that 'no one has discretion to violate the Constitution' has nothing to do with the Federal Tort Claims Act, which does not apply to constitutional violations.").

Although "Congress did not create the FTCA to address constitutional violations [but] to address violations of state tort law committed by federal employees," that does not render the constitutionality of the government's conduct an impermissible consideration for all purposes under the FTCA. *Shivers*, 1 F.4th at 930. Consider an example from the law of evidence: Although a certain statement may be inadmissible hearsay, if it is not introduced for the truth of the matter asserted, but rather to demonstrate the declarant's state of mind, it may be admissible. *See United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) ("Where, as here, the statement is offered as circumstantial evidence of Detrich's state of mind, it does not fall within the definition given by Rule 801(c); because it was not offered to prove the truth of the matter asserted."). Although a constitutional violation cannot provide the basis for an FTCA claim and would be properly raised pursuant to *Bivens*, that does not impact, let alone nullify, its relevance to the sovereign immunity of the United States. The Seventh and Eleventh Circuits treat this limitation on the DFE as one that improperly expands the availability of relief for constitutional violations, rather than what it is, a reflection of the fact that the government cannot retain its sovereign immunity from suit when its officers engage in tortious conduct that violates the Constitution.

The Court must follow the precedent of this Circuit and holds that the DFE is not applicable when a plaintiff plausibly alleges that a federal employee engaged in unconstitutional conduct. The last remaining inquiry is whether Ms. Q's complaint plausibly states a constitutional violation.

### d. Ms. Q Adequately States a First Amendment Violation

"To state a First Amendment retaliation claim sufficient to withstand a motion to dismiss, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)). Ms. Q alleges that she spoke publicly and candidly about her detention experience. *See* TAC ¶¶ 65–66. Such speech is entitled to First Amendment protections. *See, e.g.*, *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("[S]peech critical of the exercise of the State's power lies at the very center of the First Amendment."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (holding undocumented immigrants are entitled to the protections of the First Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). She also adequately alleges the second prong, as the revocation of one's OSUP qualifies as an adverse action. *See* TAC ¶¶ 68–75, 120; *see also Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir. 1989) (finding a transfer of a prisoner made solely in retaliation for the exercise of constitutionally protected rights is an adverse action); *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (An adverse action is "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.").

The Government only challenges whether Ms. Q states the third element of her *prima facie* case and argues that she has failed to "establish a causal relationship between her protected conduct

and the revocation of her OSUP." ECF No. 125 at 3. "To sufficiently allege a causal connection, [a plaintiff]'s allegations must support an inference that the protected conduct was 'a substantial or motivating factor for the adverse actions taken by [government] officials.'" *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (quoting *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003)). "Importantly, to survive a motion to dismiss for lack of causation, 'the plaintiff's pleading need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect.'" *Stajic v. City of New York*, 214 F. Supp. 3d 230, 235–36 (S.D.N.Y. 2016) (quoting *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir. 1999)). "'Causation generally is a question for the finder of fact' and '[o]n this motion, the role of the Court is to determine whether [a p]laintiff has alleged facts that could support a reasonable finding of a causal connection.'" *Id.* (quoting *DePace v. Flaherty*, 183 F. Supp. 2d 633, 638 (S.D.N.Y. 2002)).

Plaintiff asserts that "[t]he nature of her public advocacy, the timing of her re-detention, and the irregularities and statements of ICE officials involved in the process" all support an inference of retaliation. ECF No. 122 at 8–9. Plaintiff cites to cases from outside this Circuit which articulate similar factors to evaluate a causal connection in the context of immigration detention. *See id.* at 9 (citing *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917 (W.D. Tex. 2018); *Bello-Reyes v. Gaynor*, 985 F.3d 696 (9th Cir. 2021)).

In *Gutierrez-Soto*, the court denied the government's motion for summary judgment on the petitioners' First Amendment retaliation claims. *See* 317 F. Supp. 3d at 935. While awaiting a ruling on their applications for asylum, Mr. Gutierrez-Soto and his son were detained for several months and then released on parole. *Id.* at 921–22. While on parole, Mr. Gutierrez-Soto vocally criticized U.S. immigration policy, through both the press and his speech. *Id.* at 934. Petitioners

alleged that it was because of this public criticism that ICE eventually decided to revoke their parole. *Id.* In denying the motion for summary judgment, the court highlighted the temporal proximity between Mr. Gutierrez-Soto's advocacy and the parole revocation, the statements of ICE officials regarding his advocacy, and a pattern of similar actions taken against other immigrant activists. *Id.*

Although the Government does not address *Gutierrez-Soto* in its reply brief, it does argue that Ms. Q fails allege a plausible inference of causation. *See* ECF No. 125 at 3. The Government does not focus on whether the nature of her advocacy contributes to an inference of causation, but rather, challenges that the temporal proximity is too attenuated and the statements by ICE officials are irrelevant. *See id.* The Government argues that Ms. Q began her advocacy while she was detained at RCJ with the filing of her CRCL complaint. *Id.* The Government highlights that ICE released her on an OSUP three months after that complaint, and revoked the OSUP a year after her release. *See id.* The Government argues that "Plaintiff fails to allege . . . that anyone in the ICE New York Field Office indicated that the revocation of her OSUP was to retaliate or punish her; and even more fatal to her retaliation claim, she does not allege that any of the relevant ICE officials involved in the decision to revoke her OSUP had any knowledge of her activism." *Id.*

As to the timing issue, the Government's suggestion that too much time elapsed between Ms. Q's advocacy and her re-detention to demonstrate retaliation may hold some water. "A plaintiff can establish a causal connection that suggests retaliation by showing that [the] protected activity was close in time to the adverse action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). "[C]ourts have found that six and eight month gaps between the protected conduct and adverse action were sufficient" to plead a causal connection. *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (collecting cases). And although "the Second Circuit has not drawn a

bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, the weight of authority supports the view that ten or twelve months is too long." *Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 617 (S.D.N.Y. 2008) (internal quotation omitted); *but see Cronin v. St. Lawrence*, No. 08 Civ. 6346(KMK), 2009 WL 2391861, at *5 (S.D.N.Y. Aug. 5, 2009) (finding an eleven-month gap did not preclude finding causation).

Although it is unclear whether Ms. Q's advocacy began with the filing of her CRCL or her public statements post-release, even if the Court only considered the most recent date provided—March 2, 2022, when Ms. Q spoke at a roundtable hosted by New York State Assemblymembers—there would still be nine months between her protected activity and the revocation of her OSUP on December 6, 2022. [2] *See* TAC ¶¶ 66–67; *see also Ortiz v. Orange Cnty., New York*, No. 23 CV 2802 (VB), 2024 WL 113705, at *10 (S.D.N.Y. Jan. 10, 2024) (evaluating temporal proximity from the most recent protected statements on a motion to dismiss). This falls into a grey area, between timespans that are clearly short enough or too long. Courts in this District have found that, where the timespan "could at least be in the range of acceptable time periods," a plaintiff has sufficiently pleaded an inference of causation. *Agostino v. Simpson*, No. 08-CV-5760 (CS), 2008 WL 4906140, at *7 (S.D.N.Y. Nov. 17, 2008).

Even if nine months is "too long," it does not "preclude finding [a] causal connection on [a] motion to dismiss" if "other factors militate in favor of finding a sufficiently alleged causal connection." *Burton*, 664 F. Supp. 2d at 367. The relevant question is then whether the ICE's statements to Ms. Q and her counsel sufficiently corroborate an inference of retaliation.

---

[2] The Court notes that it is slightly unclear whether Plaintiff pleads that ICE retaliated against her for filing a CRCL claim. In response to the motion to dismiss, Plaintiff cites allegations from the Third Amended Complaint regarding her public statements and activism post-release on an OSUP as the "public criticism" for which ICE retaliated. *See* ECF No. 122 at 8 (citing TAC ¶¶ 66–67). On the other hand, Plaintiff also more generally alleges that ICE retaliated against her for "speaking out against misconduct." TAC ¶ 120.

The Court finds that the withheld justification for Ms. Q's re-detention and the inconsistent responses from ICE officials do bolster an inference of retaliation. Ms. Q alleges that her attorney specifically asked whether ICE had her travel documents in anticipation of the December 6, 2022 meeting. *See* TAC ¶ 67. "On December 1, 2022, Officer William Kennedy responded by email noting that ICE was in possession of two expired travel documents for Ms. Q." *Id.* On December 6, 2022, Ms. Q alleges that ICE provided neither her nor her attorney with a justification for the revocation of her OSUP. *Id.* ¶¶ 69, 71–72. The Notice of Revocation produced by ICE after the fact "claimed that ICE was revoking Ms. Q's supervised release because it obtained a valid travel document and her deportation was imminent." *Id.* ¶ 73. But "[a]bout two weeks after Ms. Q was re-detained, ICE counsel again confirmed that ICE did not possess valid travel documents for Ms. Q and deportation was not imminent." ECF No. 122 at 4 (citing TAC ¶ 73).

Ms. Q argues that this inconsistent, "pretextual justification was patently false" and contributes to an inference of retaliation, citing to *Gutierrez-Soto*. *Id.* at 9. To the extent *Gutierrez-Soto* is persuasive, the Court is hesitant to find ICE's alleged statements and omissions raise an equally strong inference. In *Gutierrez-Soto*, the statements at issue specifically referenced the petitioner's advocacy. *See* 317 F. Supp. 3d at 934 ("[A]n ICE official told him to 'tone it down' in reference to press coverage of Petitioners' detention."). There were no equivalently explicit or direct statements made to Ms. Q or her attorney when ICE revoked her OSUP. On the other hand, the Court recognizes that the petitioners had to satisfy a different and higher burden of proof in *Gutierrez-Soto*, as the court was adjudicating the government's motion for summary judgment. *See generally* 317 F. Supp. 3d 917.

The Government argues that Ms. Q fails to meet her lower burden and that these inconsistent statements should not bear on the Court's decision since "ICE can revoke an order of

supervision in many different circumstances, including if the purposes of release have been served or it is appropriate to enforce a removal order." ECF No. 125 at 3 n.3. Additionally, the Government suggests that the fact ICE "had a valid travel document for Plaintiff by February 21, 2023" demonstrates its decision to revoke Ms. Q's OSUP was legitimately based in its intention to execute her removal order. *Id.* (citing ECF No. 52).

The Court is not persuaded by the Government's arguments. Even if ICE had valid travel documentation for Ms. Q in February of 2023, taking Plaintiff's allegations as true, ICE still provided false justifications for re-detaining Ms. Q. at the time. While the Court recognizes the wide range of purposes for which ICE may revoke an OSUP, its failure to provide Ms. Q with a true justification certainly contributes to an inference of retaliation. Considering this along with the timespan between Ms. Q's protected speech and her re-detention, the Court finds Ms. Q has met her burden in pleading a *prima facie* case of retaliation under the First Amendment. Accordingly, the Discretionary Function Exception is inapplicable, and the United States does not retain its sovereign immunity.

The Government's motion to dismiss for lack of subject matter jurisdiction is **DENIED**.

## II.    Ms. Q's Abuse of Process Claim

Having established this Court's subject matter jurisdiction, the Court now turns to whether Ms. Q provides sufficient factual allegations to state her abuse of process and emotional distress claims under New York state law. The Court first considers her abuse of process claim.

Under New York law, "[t]o prove abuse of process, [a] plaintiff must show that the defendant '(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Hernandez v. United States*,

939 F.3d 191, 204 (2d Cir. 2019) (quoting *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). The Government only challenges Ms. Q's allegations by arguing that she fails to plead the revocation of her OSUP involved any "legal process." *See* ECF No. 121 at 13. More specifically, the Government argues that the "process" to revoke an OSUP is not a "legal process." *Id.*

### a. Legal Process

Traditionally, "legal process means that a court issued the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (citing *Mormon v. Baran*, 35 N.Y.S. 2d 906, 909 (Sup. Ct. 1942)). Courts have interpreted this to mean that a "court order is required to effectuate" the process. *Cohen v. United States*, 640 F. Supp. 3d 324, 345 (S.D.N.Y. 2022) (finding that a remand to prison while serving one's criminal sentence is not "legal process"), *aff'd sub nom. Cohen v. Trump*, No. 23-35, 2024 WL 20558 (2d Cir. Jan. 2, 2024). On the other hand, courts have recognized abuse of process claims where the process was not court-ordered, such as an arrest or the revocation of one's parole. *See Ficklin v. Rusinko*, 351 F. Supp. 3d 436, 450 (W.D.N.Y. 2019); *see also Rao v. City of New York*, No. 14-CV-7422 (RRM) (LB), 2018 WL 1582289, at *8 (E.D.N.Y. Mar. 29, 2018) (collecting cases on arraignments, summonses, and arrests found to constitute "legal process").

Whether a revocation of an OSUP is "legal process" appears to be an issue of first impression. Ultimately the Court need not decide whether the revocation of an OSUP qualifies as "legal process" because, even if it did, Ms. Q's abuse of process claim must be dismissed for an independent reason: she fails to plead that the process was used for an improper purpose.

### b. Ms. Q Fails to Allege an Improper Purpose

In order to state an abuse of process claim, Ms. Q must allege an "improper use of process after it was issued." *Blanco v. Success Acad. Charter Sch., Inc.*, 722 F. Supp. 3d 187, 225

(S.D.N.Y. 2024). Ms. Q argues that the Government revoked her OSUP to retaliate against her for exercising her First Amendment rights. *See* ECF No. 122 at 15–16 ("ICE initiated the action of revoking her OSUP and re-detaining her for the improper purpose of punishing her for publicly speaking out against ICE."). This is not sufficient to survive a motion to dismiss.

"[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77. In other words, "[t]he use of the instrument or process must have itself been improper." *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 638 (S.D.N.Y. 2015) (citing *Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (1984)), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016); *see also Savino*, 331 F.3d at 77–78 (citing *Dean v. Kochendorfer*, 43 N.E. 229 (1924) (distinguishing between improper motive and improper purpose)). "[T]he proper use of legal process based on an improper or malicious motive such as a desire for retaliation is insufficient." *Pinter v. City of New York*, 976 F. Supp. 2d 539, 568 (S.D.N.Y. 2013). As Ms. Q fails to allege any non-retaliatory motive, her abuse of process claim must be dismissed. *See* ECF No. 122 at 15–16.

Accordingly, the Court **GRANTS** the Government's motion to dismiss Ms. Q's abuse of process claim pursuant to Rule 12(b)(6). Her abuse of process claim is **DISMISSED** without prejudice.

### III.    Ms. Q's Emotional Distress Claims

Ms. Q's fourth cause of action is for intentional or negligent infliction of emotional distress. TAC ¶¶ 122–129. The Government argues that she fails to state a claim for either tort. *See* ECF No. 121 at 15. Regarding Ms. Q's intentional infliction of emotion distress ("IIED") claim, the

Government argues that (1) such claims are barred against governmental entities as a matter of New York public policy, (2) her other tort claims render it duplicative, and (3) it does not allege "extreme and outrageous" conduct. The Court takes each argument in turn.

### a. New York's Public Policy Bars Ms. Q's IIED Claim

"New York law provides that 'claims of intentional infliction of emotional distress against government bodies are barred as a matter of public policy.'" *Blanco v. Success Acad. Charter Sch., Inc.*, 722 F. Supp. 3d 187, 219 (S.D.N.Y. 2024) (quoting *Dillon v. City of New York*, 261 A.D.2d 34, 704 N.Y.S.2d 1, 7 (1st Dep't 1999)). The Government argues that this state judicial doctrine similarly shields it from liability for IIED claims brought under the FTCA. *See* ECF No. 121 at 15–16.

Ms. Q disagrees, highlighting that the United States's liability under the FTCA is determined by "'whether a private person would be responsible for [the tort] under the laws of the State where the acts occurred.'" *Dorking Genetics v. United States*, 76 F.3d 1261, 1266 (2d Cir. 1996) (quoting *Rayonier Inc. v. United States*, 352 U.S. 315, 319 (1957); *see* ECF No. 122 at 18. This treatment is also invoked in the United States's waiver of sovereign immunity under the FTCA. *See Dorking*, 76 F.3d at 1266 ("The FTCA . . . waives immunity under circumstances that would create liability 'in the same manner and to the same extent as a private individual under like circumstances.'" (quoting 28 U.S.C. § 2674)). Ms. Q argues that the United States must also be treated like a private person for the purposes of common law defenses and immunities, and as such cannot avail itself of New York's public policy bar.

Ultimately the Court need not decide whether New York public policy provides a viable defense, because Ms. Q's IIED claim must be dismissed for an independent reason: it is duplicative her other tort claims.

### b.  Ms. Q's IIED Claim Is Duplicative and Barred

"[I]n New York, [an IIED claim] is to be invoked only as a last resort, when traditional tort remedies are unavailable." *Thomas v. Cnty. of Putnam*, 262 F. Supp. 2d 241, 251 (S.D.N.Y. 2003). "[N]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Id.* (internal quotation omitted). "State courts and federal district courts in this Circuit have consistently held that the tort of IIED may not be used as a substitute for an available traditional tort theory." *Chau v. Donovan*, 357 F. Supp. 3d 276, 288 (S.D.N.Y. 2019) (internal quotation omitted). But, where an IIED claim involves the same conduct and conduct beyond that of the traditional tort claim, it is not duplicative. *See id.*; *see also Bensky v. Indyke*, 743 F. Supp. 3d 586, 598 (S.D.N.Y. 2024) (IIED claim was not duplicative of negligence claim); *Giuffre v. Andrew*, 579 F. Supp. 3d 429, 452 (S.D.N.Y. 2022) (IIED claim involved conduct beyond that of the plaintiff's battery claim).

In order to determine whether Ms. Q's IIED claim is duplicative of her other tort claims, the Court must clarify the exact underlying conduct. Although the motion to dismiss does not pertain to Ms. Q's "ankle injury and resulting medical treatment," her IIED claim arises in part from that conduct. *See* ECF No. 121 at 1. In her fourth cause of action, Plaintiff highlights ICE's failure to provide adequate medical care, TAC ¶ 124, placement of Ms. Q in unsanitary conditions, *id.* ¶ 125, and revocation of her OSUP, *id.* ¶ 126, as the causes of her emotional distress. All of this conduct falls under the other tort claims Ms. Q pursues. *See id.* ¶¶ 101–105 (assault and battery claim arising from Ms. Q's initial injury and harmful contact with ICE officer); *id.* ¶¶ 106–116 (negligence claim arising from inadequate physical and mental medical treatment, unsanitary living conditions, and threats of retaliation); *id.* ¶¶ 117–121 (abuse of process claim arising from the revocation of Ms. Q's OSUP and harmful conditions upon re-detention).

Plaintiff argues that because no one tort claim completely overlaps with the conduct underlying her IIED claim, the Court should allow her IIED claim to proceed. *See* ECF No. 122 at 23–25. To support this argument, Plaintiff cites a Secord Circuit opinion addressing New York's IIED doctrine, particularly as it pertains to "gap-filler" claims. *See id.* at 23 (citing *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 159 (2d Cir. 2014)). Although the *Turley* court referenced the foundation of this doctrine to be in *dictum* from the New York Court of Appeals, it did not go so far as to say that courts should permit "gap-filler" IIED claims. *See Turley*, 774 F.3d at 160. Instead, the Circuit concluded that it "might be best addressed by certifying a question to the New York Court of Appeals." *Id.* Ultimately, the Circuit deferred rendering a decision on this issue because the defendants had forfeited it in the lower court. *See id*; *see also Bender v. City of New York*, 78 F.3d 787, 792 (2d Cir. 1996) (declining to resolve the same issue).

In the absence of any authority from the Second Circuit or New York Court of Appeals endorsing Plaintiff's contention that an IIED claim may survive when no one other tort claim encompasses the same conduct, the Court declines to do so. The numerous opinions where federal and state courts have decided similarly also weighs in favor of the Court's conclusion. *See, e.g.*, *Thomas v. Cnty. of Putnam*, 262 F. Supp. 2d 241, 251 (S.D.N.Y. 2003) ("[T]he conduct complained of is encompassed in plaintiff's claims for malicious prosecution and false arrest and imprisonment."); *Warr v. Liberatore*, 270 F. Supp. 3d 637, 654–55 (W.D.N.Y. 2017) (dismissing IIED claim as duplicative of false arrest, excessive use of force, and assault and battery claims); *Naccarato v. Scarselli*, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000) (dismissing IIED claim as duplicative of assault and battery and malicious prosecution claims).

The Court finds Ms. Q's IIED claim to be duplicative of her assault and battery, negligence, and abuse of process tort claims. Given this, the Court need not consider whether Ms. Q

sufficiently pleads her IIED claim. The Government's motion to dismiss Ms. Q's IIED claim is **GRANTED**. Ms. Q's IIED claim is **DISMISSED** without prejudice.

### c.  Ms. Q's NIED Claim Is Not Duplicative

The Government also challenges Ms. Q's negligent infliction of emotional distress (NIED) claim as duplicative, so the Court will begin there. *See* ECF No. 121 at 20–22. Several courts in this District have found the doctrine against duplicative IIED claims to apply equally to NIED claims. *See e.g.*, *Fernandez v. City of New York*, 457 F. Supp. 3d 364, 398 (S.D.N.Y. 2020) ("New York law explicitly bars recovery for negligent or intentional infliction of emotional distress when such claims are based on conduct that is embraced by a traditional tort remedy." (citing *E.E.O.C. v. Die Fliedermaus*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999))); *Druschke v. Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005) ("[T]he Court concludes that Druschke has alleged no facts that would allow her to maintain a separate claim for IIED or NIED 'where, as here, the conduct for the underlying claim may be redressed by way of traditional tort remedies such as battery, false arrest, and malicious prosecution.'" (citing *Campoverde v. Sony Pictures Ent.*, No. 01 CIV. 7775(LAP), 2002 WL 31163804, at *12 (S.D.N.Y. Sept. 30, 2002))). It is unclear where this inclusion of NIED claims originates, as even the cases cited in several of these opinions only found IIED claims were barred as duplicative. *See Die Fliedermaus*, 77 F. Supp. 2d at 472–73 (only analyzing IIED); *Campoverde*, 2002 WL 31163804, at *11–13 (finding the plaintiff's IIED claims to be duplicative and dismissing the NIED claims on other grounds).

Regardless, even though several courts have treated IIED and NIED claims identically under this doctrine, the New York Court of Appeals has never articulated such a rule. *See Caravalho v. City of New York*, No. 13CV4174PKCMHD, 2016 WL 1274575, at *23 (S.D.N.Y. Mar. 31, 2016) (recognizing that district courts in the Second Circuit have found NIED claims

duplicative while the New York Court of Appeals has only applied the doctrine to IIED claims). The Court is hesitant to adopt such a rule, especially given the Circuit's caution in applying this doctrine to "gap-filler" IIED claims. *See supra* III.b (citing *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 159 (2d Cir. 2014); *Bender v. City of New York*, 78 F.3d 787, 791 (2d Cir. 1996)).

Although the Court understands how the rationale undergirding this doctrine may apply equally to NIED claims, in absence of case law from the Second Circuit or New York Court of Appeals, the Court does not find that Ms. Q's NIED claim is barred as duplicative.

### d. Ms. Q Adequately States Her NIED Claim

The Government challenges Ms. Q's NIED claim on two additional bases: (1) that it is premised on intentional conduct and (2) that Ms. Q fails to allege a specific duty ICE owed her. *See* ECF No. 121 at 18, 19. Crucially both of these arguments were made only regarding any portion of Ms. Q's NIED claim related to the revocation of her OSUP, an intentional act for which the Government contends it owed Ms. Q no duty. *See id.* at 18 ("Plaintiff's negligent infliction of emotional distress claim, arising out of ICE's revocation of her order of supervision and her resulting detention, fails because it is premised on intentional conduct."); *id.* at 19 ("Plaintiff alleges no specific duty that ICE owed to her."). In response, Ms. Q clarifies that her NIED claim arises from "the inadequate medical care ICE provided while Ms. Q was in its custody, before she was released on an OSUP." ECF No. 122 at 21.

Given that her IIED and NIED claims are included under the same cause of action, it is not entirely clear which allegations pertain to which claim. *See* TAC ¶¶ 124–26 (discussing Ms. Q's injury, medical care, conditions of confinement, and re-detention). Drawing all reasonable inferences in her favor, the Court construes the fourth cause of action to raise an NIED claim based on the allegedly inadequate medical care ICE provided Ms. Q during her first period in ICE

custody. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). Regarding this conduct, the Government only challenges Ms. Q's NIED claim as "entirely duplicative of her negligence claim." ECF No. 125 at 10. Having already addressed this issue, the Court **DENIES** the Government's motion to dismiss Ms. Q's NIED claim.


## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's motion to dismiss Ms. Q's abuse of process and intentional infliction of emotional distress claims. Those claims are **DISMISSED** without prejudice. In all other respects, the Government's motion to dismiss is **DENIED**. The parties are directed to proceed with general pre-trial matters on the surviving claims before Magistrate Judge Katharine H. Parker. The Clerk of Court is respectfully directed to terminate the pending motion at ECF No. 120.


**SO ORDERED.**

Dated:  **March 31, 2025**
        **New York, New York**

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**